Case number 24-5075 New Mexico Cattle Growers' Association Appellants v. United States Fish and Wildlife Service, et al. Mr. Yates for the Appellants, Ms. Yowell for the Federal Appellees, Mr. Shannon for Appellees' Center for Biological Diversity, and Maricopa Oribón Society. Good morning, Mr. Yates. Good morning, and may it please the Court. This case is somewhat unique in that during the course of its journey from the District Court to this Court, a number of points of agreement appear to have emerged, and the real dispute at issue has somewhat changed. So I'd like to begin by briefly addressing those points of agreement and stating what I believe to be the now real dispute in issue. So all parties now agree that the Service must apply a standard when delineating subspecies. All agree that the standard must be more than mere reliance on the majority opinion of taxonomists. All agree that the standard cannot shift arbitrarily during the course of a rulemaking. And all agree that the standard must in some way permit for replication, even if not in a strictly falsifiable sense. So the question now is whether the standard announced by the Service, that of non-clinal geographic variation, is consistent with the requirements of the Administrative Procedure Act and the Endangered Species Act, and Cattle Growers submits that it is not. Now under this standard, all acknowledge that there can be no subspecies where there exists a smooth cline, that is a gradual linear change in the species' character traits across its geographic range. Now the reason for this is that variation upon a smooth cline is manipulable, it's arbitrary, and it reduces what is a subspecies to a mere subpopulation of a species by arbitrarily just dividing up a smooth... Did Cattle Growers raise this argument before the District Court? Yes, Your Honour. In the District Court, we did brief the manipulability and the non-clinal geographic variation standard, among other issues. But the question that you say is now the main question at dispute about whether relying on a non-clinal geographic... Well, relying on that standard is reasonable. Is that something that you argued? I mean, it's not even really in the opening brief here, it's primarily in your reply brief. Yes, Your Honour. So we did argue it in terms of its inconsistency with the ESA and the APA, due to the sort of development of the issues, the issue was somewhat crystallized. So by the time we were on reply at this court, I think we had a firm of sense about what the real dispute was, somewhat a function of the history of this case, where there were a much broader array of disputes in the District Court. I'm not sure. I'm entirely clear on what you're saying is the crystallized dispute. You said that there's no subspecies when there's a smooth cline. But then you said variation along a smooth cline is manipulable. I thought your argument was that a step cline, that one could manipulate data to show a putative step cline where there actually isn't any? Correct, Your Honour. And I think what our argument here is, is that when looking for a step cline, based on the record here, the standard was basically incapable of demonstrating a lack of a smooth cline. And that's where we think the manipulation is, because the standard, as it was applied here, essentially comes down to a function of the data that the service assessed. So the evidentiary choices we would submit were driving the decisional standard. Okay. Well, that seems to me, if it's about the evidentiary choices, and I thought you actually had disavowed that in your reply brief. But to the extent that you're saying that this standard is open-ended as to what evidence might be brought to bear under it, why is it not the law that where you have a standard like that, that it's somewhat open-ended as to what the evidentiary body of fact is to which it applies, the check is that a challenger or a commenter can raise evidence that they think that the agency has failed to take into account. And that is the check against a cherry-picking on the part of the agency. Well, yes, Your Honour. But we would submit that that's a somewhat secondary question, because our arguments are primarily directed towards the actual standard and the requirement of a standard. So our position is the standard is driven by no principle whatsoever. It's not really a true standard if it's entirely a function of evidentiary choices. So the way we're thinking about this is the service needs to set a standard in order to operate on the best available science in the record, so we know what we're actually seeking to prove. So this is exactly what I'm finding confusing about your briefing. It seems like at some points you're saying the standard doesn't allow falsification of the subspecies determination, to which I would respond, well, it does. It says if it's a smooth climb, there's no subspecies. If it's a step climb, there may be. And to the extent that you're worried about cherry-picking evidence, commenters, challengers, anyone can bring in evidence and say, hey, agency, you're cherry-picking. So that seems to me the notion that there's evidentiary choice. I mean, thousands of decisions, thousands of standards that agencies apply depend on selection of some subset of evidence, right? Yes, I understand. But then I take you to be saying, and you don't put it this way, but is it that the choice of, for shorthand, what I'll call the step-climb standard, is itself non-falsifiable? Is that part of your challenge? We think it's inherently manipulable, and there are falsifiability issues with it, because the concern is... No, no, no. You have to be clear for my person. This is the thing I'm not understanding. Is this applicability of the standard manipulable, or is the choice the agency made to understand subspecies in this way the thing that you're challenging? The latter, Your Honour, because we think understanding subspecies in this way, it renders the decision purely a function of the evidentiary choices, and it doesn't provide an overarching principle going to the issue of commenters submitting additional data. So it's not that they could have chosen a different standard, but they chose this one, and how do we tell which is the right one? That's not your argument. They could have chosen a different definition of subspecies, and they chose this one, and it has to be a falsifiable choice at that level? So we would concede that there are other lawful applications of the subspecies standard, and our argument here is that the standard they've chosen here, both in its effect and in its sort of overarching principle, doesn't permit for falsifiability, or it's inherently manipulable and incapable of really demonstrating what the service is setting out to demonstrate, which is the existence of a step plan. Because again, looking at the studies in the record here, the primary studies that the service relied upon, Cedric 2001, Paxson 2008, Paxson 2010, these studies all had a sampling bias in that their sampling sites were all located sort of a priori in the geographic core of the subspecies as it's historically defined. So they graphed the data, they determined a step client, but that step client we would submit was purely a function of those evidentiary choices and the decision to omit intermediary data on the centre of the client. Mr. Yates, while you suggest that clinal variation isn't really the right standard, the evidence that Cattle Growers puts forward is all about whether there is clinal variation. So that suggests that if, for instance, the service found the zinc study persuasive, it would have reached different results. So you suggest that clinal variation is not a reasonable standard, but the only evidence that you put forward to rebut that is that, you know, there is no step client here, that there's a gradual. So how do we reconcile those things? I think our position would be that the inability to affirmatively disprove the existence of a smooth client is the issue. A step client or a smooth client? A smooth client. So the existence of it, I apologise, the existence of a step client here or the non-existence of a smooth client is purely a function of the evidentiary choices that were made. So here in the record, in the particular application here, the decision in those studies to omit intermediary data from the centre of the client. So sure, there's a sharp distinction you can see when this is graphed, but that's purely an artefact of those evidentiary choices. It's a somewhat common sense proposition that if you graph something and you omit intermediary data, the ends of that graph are going to appear to be sharply distinct, but that's a function, an artefact of those evidentiary choices. I don't take that to be the argument in Zink's analysis. Am I wrong? Is that exactly the argument you think he made? It's not the precise argument Zink made. Zink made a number of arguments, but I would clarify that this isn't just purely a dispute between Dr Zink. Right. I understood you to be saying that in the reply brief. Where I'm going is that I'm not sure you've put that dispute as you now describe it anywhere in the record, either administrative record or in the district court. So we made arguments related to the but we believe that the issues have somewhat crystallized by this point of the proceedings by the time we were on reply. Because in the district court, there were sort of broader disputes over whether the service even needs to set a sort of overarching... It's a nice way of characterizing the fact that a lot of these issues seem to have been forfeited along the way. I don't believe we forfeited them. I think we preserved them enough because I'm not making any point that isn't directly addressed in the briefing, although we have somewhat pivoting again as a result of the crystallization of the issues. But I take your Honour's concern. Mr Yates, you mentioned a few moments ago that it's your client's position that there are other lawful definitions of subspecies that could have been used. Can you give me an example of what you're thinking of there? Yes, Your Honour. And to be clear, we're not directing the court to, or asking the court to direct the service to say adopt one of these standards, but we do think... No, but for illustrative purposes. Illustrative purposes, yeah. We do think it's possible to lawfully define and non-arbitrarily define subspecies. I would point Your Honour's attention to the 75% rule in which 75% of the purported subspecies is outside 99% of the range of the broader species with respect to a particular defining character of variation. That's sort of an overlay that can exist over cliental geographic variation to qualify it somewhat. I'm not sure that I follow that because there you have to have a definition of, you have to already have differentiated subspecies from species in order to know what you're counting to come up with your 75% and your 99%. Am I wrong? So there's a little bit of a circularity there. Well, I think if you look at it... Maybe a confirming separate layer, but you have to have some way of actually, in the first instance, determining what's a species and what's a subspecies. I think you would have to have a hypothesis and then the purpose of the 75% rule would be to test it. And that's not as data manipulable in your view as the standard that the service employed? Provided that the investigator looks at all of the available data across geographic range, and that's where the sort of 99-75 distinction comes in because it forces you to look at the entire client rather than omitting particular data. You mentioned that you're not requiring us to adopt any particular definition of species or subspecies, but have you offered any type of alternative definition? Yes, Your Honour. We would submit that the 75% rule is lawful. We don't think that it's mandatory for it to be applied here. But again, for illustrative purposes, I suppose, we point that out to note that this question is answerable. It's not a question of sort of pure scientific uncertainty. There are standards that exist in the literature, which we believe do satisfy the requirements that we're setting forth. But I guess I'm asking, are you being specific enough with respect to having not forfeited? Like, have you affirmatively put out a specific standard and the criteria that you want us to use with respect to delisting this particular species? We're not asking the court to direct the delisting of this species. The remedy that we've requested just as a function of the ESA's petition requirements, it's quite a narrow remedy. We're essentially asking the court to remand this to the Fish and Wildlife Service for them to do notice and comment essentially again, or another rulemaking, applying a non-arbitrary standard, which I think that's where the court's guidance would come in, to ensure that going forward with this particular species, they're acting in a lawful manner. But did you, during the rulemaking and comment period, offer that as a comment, even during that time? In the petition, we didn't set forth any particular standard. We identified flaws in what the current data the service has relied upon. And I think that's really the issue in this case. It's a state that this isn't sort of a sub-rosa litigation over the services having to set forth an overarching or broad standard to apply to all species. That's not what we're asking for here. I have a very specific question, which is in your brief, what do you mean by the statement that the non-clinal geographic variation standard is incapable of demonstrating mean differences at the population level? Essentially that it's a function of individuals and individual data sampling choices, as opposed to an overarching choice, like say something like the 75% rule, which helps you to actually graph the entire population of the species. Our position is essentially the way this standard was applied here. Again, due to those sort of data sampling issues, the fact that you could always find variation between individual birds, that's a manipulability issue. And the lack of a mean difference at the population level. Mean difference at the population level, mean difference between what and what? The species and the subspecies? Between the subspecies and its neighbouring subspecies or the broader species. That is what the standard is designed to do. And the manipulability that you posit, I'm just not entirely following because what I understand is done is that every bird of, let's say, umbrella species that is recorded or as to which there is data is accumulated. And its location, so the geography is part of the definition here about capable of interbreeding, but not interbreeding across discernible geographic boundaries. And that they are looking at all the data and that they are determining if you try to chart on the geographic areas, that there are in fact discernible differences that can't be manipulated away. If you looked at people who live in Quebec versus people who live in the northeastern United States and you graph what languages they speak, you're going to find that the people north of the border, more of them speak French. And the people south of the border, fewer of them speak French. And you can tell that they're different language populations based on that. And so I guess I'm just not understanding the manipulability problem that you identify if there's something different about what's going on here that I'm not understanding. I understand, Your Honor. I think to go to your hypothetical route related to language differences, I think that's something somewhat easier to test because it's something of a result of jurisdictional limits and whatnot. And you're only looking for one thing, which is language, as opposed to here, attempting to graph multiple things, making choices, multiple character traits. So DIMA 2016, for example, said, I'm going to look at one particular variation in plumage coloration for the southwestern willow flycatcher. Zinc 2017 looked for six. So there's a sampling choice and lo and behold, they both came to polar opposite conclusions regarding the existence of a species. And we will note, and again, not touting zinc as the sort of end all and be all or the ultimate correct answer, but Dr. Zinc did look more holistically at the data that was available and he determined that there was no way to find a true step client across the southwest willow flycatchers range and through its intergradation zone. So I'm sure I'm going to axes of differentiation and look at them all together and said that the statistical step client disappeared when you did it that way. Correct. That's essentially Zinc's conclusion about studies. Go ahead. I was going to say, but even placing the standard aside, I didn't see you address these ecological distinctions between subspecies and other populations of the willow flycatcher. Yes, your honor. So our brief contains some discussions on the dispute between Thimer and Zinc, both in the background and in the argument. And it also contains a discussion of Sedgwick-Pax and both Paxton studies as well as the unit study to draw out this point regarding sort of geographic manipulability and non-clinal geographic variation that can be found in the opening brief towards the latter portion of the argument, the falsifiability subheading and also on reply. Make a constitutional avoidance argument based on non-delegation, but you don't have a challenge to the statute. I'm not sure how the constitutional avoidance argument comes in. I take your point, your honor. I think a response to that would be that we have an arbitrary and capricious contrary to law claim in the complaint. That's essentially what we've briefed. And there are, due to the sort of mixed question of law and fact that we think is present here, this question of, well, what does the law and the ESA require with regard to a standard? And then how is that standard applied to the data in the record? We think that the avoidance argument comes in under a sort of statutory challenge, a contention that the ESA requires more with regard to a standard setting requirement. So am I right that the argument you're making is that you wouldn't make a facial challenge to the statute that the term subspecies is constitutes an unconstitutional delegation from Congress to the agency? Because in your view, there are ways to interpret that, that hue more closely to its real meaning and therefore no facial non-delegation problem, but that to the extent that the service is permitted to understand subspecies in the way it has, that category of understandings, the non-falsifiable choice of operationalizing the standard, if that's allowed, then anything goes, then that understanding of the statute is a delegation problem? Yes, Your Honor, that's essentially our argument that if the standard renders hypotheses, nothing more than a self-fulfilling prophecy, a sort of I know it when I see it type standard, which is essentially our argument boiled down, then that becomes to interpret the ESA in that would raise non-delegation issues because the service is essentially making it up as it goes and not conducting itself according to any sort of overarching standard or principle to cabinet's discretion. Mr. Yates, though, I'm not aware that the cattle growers brought a contrary to law argument either in the district court or here. It seems the whole argument is about arbitrary and capricious review, so not about contrary to law review. And an agency can't cure a non-delegation problem by binding itself to a reasonable understanding. Either the statute is an impermissible delegation or it's not. That legal question is irrespective of how the agency chooses to interpret the statute. So I and I'm not really sure I understand what's being advanced here. I understand, Your Honor. So the sort of contrary to law element of our arbitrary and capricious claim, it comes in when we start talking about there's a mixed question of law and fact that is here. What are we really arguing over? The service seems to conceptualize this as being in sort of pure state farm territory. We think that there is a statutory component here because we're addressing our arguments towards the standard or rule mandated by the APA and Endangered Species Act to act in the sort of second arbitrary and capricious phase of the decision making here. Where in your brief, even in your opening brief here, do you make a contrary to law challenge? Not per se. I mean, if you look in the standard of review, we address that. That's not an argument. So we look in the standard of review and then we, our arguments related to falsifiability and the sort of arbitrariness of the standard, they're largely directed towards that pre-existing standard, which we do contend is contrary to law, even if not in the most crystallized terms. I would also suggest that when you're asking us to look at the science, it seems as if you're trying to have us make a determination about the science instead of us actually determining if the science supports the conclusions reached. And generally, we would defer to the experts in that regard, not us determine if the science is actually correct. Yes, your honor. So I think our position is that the standard as it was applied here is incapable of supporting the conclusion reached for various reasons related to its manipulability and arbitrariness. Although we don't ask the court to make a determination as to what the experts should find on remand, just to address the sort of overarching decisional standard or framework within which the experts are to marshal their expertise. How can you say, and I'm not trying to be contentious, I really am trying to understand how you can say that the standard as applied is incapable of supporting the conclusion reached in light of a 90 odd page report by the service explaining how it supports the conclusion reached. So we think it comes down to the standard that was applied at the top of that 90 page finding. If there's a concern or arbitrariness manipulability issue with the standard, then everything that follows is not going to prove what ultimately must be proven. I have one other question, which is, you make an argument that arises out of the Congress's amendment of the statute to replace the terms smaller taxa with the term distinct population segment. And I wasn't sure that I was tracking what you were getting out of that. Can you explain what we should draw from the services or the Congress's treatment of distinct population segment? Yes, Your Honor. So assuming our argument is correct related to the manipulability of the standard applied here, and if the standard is incapable of disproving a smooth climb, then any subspecies determination ends up basically being a sort of arbitrary geographical divvying up of that smooth climb as opposed to anything else. And our position is that when that occurs, you're essentially reducing what is a subspecies to a mere subpopulation of a species, just a population below the species level. Now, the smaller taxa versus DPS issue in 1978, the ESA was amended to remove that smaller taxa, essentially subpopulation type language, and replace it with the more specific and demanding DPS concept. So that's the argument sort of fleshed out. So it doesn't really depend on the shift in language because you still had these three buckets under both the earlier and the later statute. And the question is, and I thought that Congress treats all of those as things that could be threatened or in danger. Yes, Your Honor, but no longer smaller taxa, DPS instead. Right. And so a distinct population segment, you said that a subspecies could be just a population segment, and therefore actually falling on a smooth climb. But the statute talks about a distinct population segment, which I'm not sure what the meaning of it is, but I guess I'm just not following what this language argument adds to your general argument that you think that data is manipulable, and that depending on how many variables you choose to combine or not, you're going to have smooth climb versus step. Yes, Your Honor. So we think that a subpopulation, the sort of smaller taxa, is a broader expression than distinct population segment. Congress amended the ESA in 1978 to remove the smaller taxa language and it replaced it with this distinct population segment language. So we think anything below the subspecies level, smaller taxa, it has to meet the DPS requirements now in order to be listed. So again, taking our subpopulation, subspecies becomes a subpopulation, and that's an issue under the Endangered Species Act because they're essentially listing smaller taxa without the rigor of the DPS standard. Why isn't a subspecies still a subspecies and a smaller taxa becomes a distinct population segment? I'm not sure why you're moving around the priority of those three terms. So the service can no longer list smaller taxa. Right, but they can list distinct population segments? Correct, according to the 1996 policy, which is lengthy and has a lot of requirements and standards and things of that nature. In short, it would require more than divvying a smooth climb in an unqualified manner because it's essentially a legal standard. All right. Thank you. Thank you. I appreciate it. Ms. Yowell for the Federal Appaloose. May it please the Court. Cattle Growers makes clear today that its complaint here is with the service has used to determine whether the southwestern willow flycatcher was a valid subspecies. I will discuss why that methodology and the service's decision explaining it is reasonable and reasonably explained in a minute. But first, I want to note that cattle growers did not take issue with the methodology in its petition for delisting. Which methodology are you referring to? Sure, Your Honor. The service's decision to look for non-clinal variations across the range. And by non-clinal, I just mean abrupt or sharp distinctions versus smooth or gradual distinctions. So cattle growers' petition acknowledged that avian taxonomists look at these types of variations and certain traits. And the petition simply argued that a new analysis of the data showed that there were no abrupt variations that would suggest that the subspecies was valid. Now cattle growers is saying that the service should not have looked at these types of variations at all. But cattle growers never raised this criticism in its petition and any supplement to its petition or in any comments to the agency. It has thus forfeited the opportunity to seek judicial review of its claim under this court's decision and advocates for highway and auto safety. I'm not sure that it's presented here, but to the extent that cattle growers is challenging the service's decision to use the, I'll just shorthand it as the step-climb standard. Is that an evidentiary standard? Or how does the service decide that that is the right way to implement the statutory term subspecies? Sure, Your Honor. So I would call it a methodology, the step looking for these step-climb variations. And I think it's helpful to think about this in two steps. So when the service looks to determine whether something is a subspecies, it marshals the best scientific evidence in two steps. First, it looks at standard taxonomic distinctions and criteria for determining the specific subspecies at issue. Here we're looking at avian subspecies or specifically the willow flycatcher. And then once those criterias are determined and explained, then the service looks at the best available science to determine whether those criteria are met. And here the service explained at JA583 that these step-climbs have been the prevailing methodology that avian taxonomists have looked at since the 1800s. And it's also the methodology that Zink 2015 and Cattle Growers Petition applied. And you can see that at JA479 and JA486. To the extent that there's a question about how to apply that prevailing methodology, for example, whether to combine all the different variables and then chart the step or the line versus to do the characteristics separately, is that something that the service has looked at? Is there prevailing methodology or do you just think that's not been raised in the administrative record in this case? Yeah, I'm not sure that that challenge has been raised in the administrative record with that specificity. So if you look at Cattle Growers Petition and the Zink 2015 study, like the main source of disagreement here is that, so first I'll note that Zink looked at the existing data that the service has been looking at since the 1990s and the early 2000s. Zink just re-analyzed that data. And his main argument was that the service, for example, let me make this more concrete, like when the service is looking at the color of the feathers of the bird, Zink has said that one criticism was that the service didn't include certain samples from boundary birds. So birds that were at the boundary of the subspecies line between the southwestern willow flycatcher and then the northern subspecies. And he said that once you include those boundary birds, then there's a more, there's that smooth climb, the more gradual change instead of the abrupt change that Paxton 2010 had found. And the service confronted that criticism and talked about it and pointed out the fact that there was another study, the Thimer study in 2016, that looked at the same data that Zink looked at, included the boundary birds that Zink said should have been included, and found that there were these step climbs or these abrupt variations in the bird feather colors. So what you have is the exact same data and just a different interpretation of the data. And as long as the service's decision was reasonably and reasonably explained, it is entitled to choose one interpretation over the other. And this court's precedent is very clear that just a disagreement with how the data is interpreted is not arbitrary and capricious. You mentioned that the service uses the best available data, but are you, and don't seem to specifically state a standard by name, but are you implicitly using the non-clinical geographical variation standard? Yes, Your Honors. So the service looked to the best available science to determine what the prevailing methodology is for determining whether an avian subspecies, or whether a certain group of birds is a subspecies. And here, scientists have been looking for these sorts of variations in feather color, in genetics, in song patterns for over 70 years. And so the service determined that that methodology for this particular subspecies was the best available science, was the best available methodology. And then the service, after it set the methodology, then the service again looked at the best available science to see if that criteria was met. I guess what I'm asking is, are you implicitly categorizing this as the non-clinical geographical variation standard without explicitly stating that? In other words, are you giving it a name in terms of what your methodology is versus just going to the best available science and then kind of defragmenting from there? Yes, Your Honor. If you look at JA583, the service specifically outlined this methodology and said that this was the methodology that was supported in the science, and it was the methodology that it was applying. And then in the pages onwards, the service applied it into each specific trait. But I will note the service applied this methodology only to the southwestern willow catcher. And that's important because this science applies different sorts of methodologies to determine different sorts of subspecies across taxa. I was wondering if at the time the service made its finding, were there comments about the fact that non-clinical variation is just a method that is, you know, imprecise or, you know, you know, as a methodology that it has problems, or is that methodology itself well enough established? I don't remember seeing any comments on the record, and Cattle Growers certainly hasn't pointed to any that are there. And Cattle Growers did not raise a general argument about that. No, Your Honor. And in the zinc study, it seems some of the, and tell me, I mean, the difference between zinc and the other studies is whether or not there is a step cline or gradual cline.  It's not, zinc doesn't challenge the methodology of looking for clines. Is that correct? Or looking for step clines? Exactly, Your Honor. So I think that really illustrates that what, although Cattle Growers is framing its challenge as a methodology problem, what it really is is a hypothetical data problem. And Cattle Growers hasn't pointed to any data that the service here has missed or has, you know, manipulated at all. It just has a different interpretation of the data that everyone agrees, you know, has been the data that scientists have been looking at for the last few decades. And you seem to indicate that with respect to this subspecies of the flycatcher, that you may look at some revisions in the future. And I know that you do your five-year review, but can you tell us a little bit about what were you anticipating in terms of any issues with respect to this subspecies? Sure, Your Honor. So as our brief noted, you know, taxonomy is constantly changing, as is all science. And in this particular area, the service in its study flagged some areas for future study. And I think as in all taxonomy fields right now, like, more genetic data, you know, could be on the horizon, and that could really help crystallize a lot of different subspecies. And so in the future, you know, I would expect if the science is collecting new data, that I would expect a renewed focus on the genetic data. But the service looked at the available existing genetic data here and determined that the genetic data supported these abrupt variations in the feather color, as well as the song patterns. And I'll note that not only are there these variations in the three traits, the song patterns, the feather color, and the genetics, but the variations break at almost exactly the same geographic line. And so the combination of the fact that there are these abrupt variations, and they're breaking at, you know, a similar line, the service found, you know, strongly suggested that this was a subspecies. So to the extent that Zink, in his study, graphs the data and finds a smooth climb, can you give us any sort of, like, layperson's appreciation of your understanding of how that could have happened? Oh, Your Honor, there's a lot of discussion in the record about whether Zink correctly graphed the data. So Thimer, for example, talks about how he doesn't think that Zink graphed the data correctly, and the service talks about that at JA594. But my best lay understanding of this is that Zink was saying, look, if you include these samples of birds at the boundaries, then the data shows, you know, a smoother climb than these abrupt step climbs that we're looking for. And again, the service found, based on Thimer 2016, as well as, you know, plenty of other, like, studies in the record that, you know, Zink was misinterpreting the data. Seems like if you have a step climb that, depending on whether you look at the boundary birds, that it could either turn a corner into the steeper part of the graph, or curve into the steeper part. But in either case, if the data on either side, the core of subspecies A and the core of subspecies B, there's going to be a nonlinear, a gap between those two that is at a steeper angle than the distance between them is capable of reflecting. So I guess, I think that's my common sense understanding. Does that seem right to you? Yes. You know, I'm not a scientist or a graph expert, but that seems right to me, Your Honor. You explained it much better than I did. And I think, to the extent that it's helpful, I think looking at cattle growers or pie reef on page 15 really, you know, kind of crystallizes the issues here. So cattle growers does these two hypothetical figures to kind of explain what it's talking about. And it says that the top one is a valid step climb and thus a valid methodology and a valid way to determine species. But the bottom, it says, is not a valid way to determine species because there's this missing data. And I think that that really shows that it's not a methodology problem because cattle growers admits that the methodology is correct in the first graph. It's really a missing data problem. And here, cattle growers just hasn't been able to put forward any data that the service missed or overlooked or didn't talk about. And as this court found in Wildlands, that's their burden. If they want to show that it's arbitrary and capricious, the path forward is to show the data. It's not to do an attack on methodology. And it's just as an aside, these figures are just illustrative. They're not in the record, but I do think that they clearly show the problem with cattle growers' argument here. But they also aren't analogous because point A' and B' are in different locations in the two graphs. And if they weren't, if the poor data on the two, you know, subspecies A and subspecies B were accepted, then it sort of would matter whether there is just a constant kind of gradual shift among the entire population as distinct from a break. And it just seems to me that that is susceptible of falsification, it's susceptible of testing by data, it's susceptible of retesting, of questioning inadequate data that might have shown an illusory step. Yeah, I completely agree with you, Your Honor. And that's what Zink is purporting to do. He's purporting to show that a re-analysis of the data would show that the service's conclusions were wrong. And again, the service thoroughly discussed Zink and his conclusions and decided that those were not the best available science. Cattle growers argue that the service relied on two other standards besides non-clinal geographic variation, that it applied a majority opinion standard and a just sort of top-line best scientific and commercial data standard. What's your response there? Yes, Your Honor. They make those arguments. The service didn't rely on a majority counting of experts standard. In fact, the quote that cattle growers uses there is a cherry-picked quote from the original listing, and actually the word majority doesn't even appear in the service's finding here. Although you mentioned yourself today that the step-climb analysis is the prevailing taxonomic methodology for discerning subspecies. Yes, Your Honor. That definitely lends support to the service's conclusion here that scientists have been looking at this type of methodology for the last 70 years, and Zink himself is looking at that methodology. But the service chose that methodology for more than just the fact that applied this methodology, and the service had very good reason for choosing that. It wasn't just an arbitrary numbers counting reason. And then as for the best available science, again, the Congress directed the service to rely on the best available science, and I think it's helpful to think of it as being in two steps. First, to look at the science to determine the methodology, and then second, to look to see whether the criteria is met. You'd embrace the appropriateness of looking at best available science, not necessarily data, but sort of scientific framework. Absolutely. Yes, and if you look at the court's decisions in the polar bear ESA listings, the Schaeffer case, the Southwestern Center for Biological Diversity case, all of those cases stand for the proposition that the service isn't required to adopt like a perfect methodology, but that methodology must be reasonable, reasonably explained and supported by the science. And I believe the record clearly shows that that standard has been met here. All right. Thank you. Good morning, Mr. Shannon. Good morning. I believe my colleague addressed many of the points that I would have addressed this morning, but I just want to offer a couple of specific answers to questions that you raised. Judge Rao, you asked about the validity or persistence of nonclinal variation as a way of delineating subspecies. And I would point your attention to a quote at JA583. Quote, the persistence of the subspecies category since the mid-1800s, as described by Remsen 2010, is driven by the perception that the category that we term subspecies can include within a name subpopulations to identify nonclinal geographic variation. And then following a parenthetical, it goes on to say some systematists recognize subspecies only if there's a narrow geographic region of changing character, a stepcline. And I think that's what the best available science shows here with the services finding and Thimer et al. demonstrating a stepcline based on morphology and genetics. And I'll note that although there has been some shift in appellant's arguments throughout the course of this briefing, on page 12 of their reply brief, they concede that stepcline change across the geographic range of a species indicates the existence of a subspecies. And the best available science here shows that. I think they also suggest that the standard is somehow capable of manipulation. What I think they fail to show is that there has been any manipulation here. Under the best available science standard, the service goes out and it surveys available scientific data. It doesn't have to conduct its own studies, and it didn't conduct any of its own studies here. So it's just looking at all of the scientific data that is available to it, including the data presented by appellants attempting to disprove stepcline or nonclinal variation, and assesses the validity of that. And in its expertise, it comes to a conclusion based on the weight of the scientific evidence, which they did so in their well-reasoned 91-page denial of the delisting petition. I'm happy to address any other questions. So I should have asked this of the service, but I wonder if you can help me understand the role of the statutory protection of any distinct population segment. I wasn't entirely clear on whether there was any debate about that. I know it's not directly an issue, but I thought it was being brought in as kind of a tool for broader statutory interpretation. Do you have any sense of what role that plays, or has the service kind of sidelined that, and what the argument is in this case? Yes, Your Honor. I think it's necessarily sidelined because the service was making a determination about whether or not it was a valid subspecies. Are they sidelined in general, or are there endangerment or threat evaluations that they've made with respect to distinct? They've certainly listed species based on the DPS policy in the past. I think the most common example would be actually with nymphs. Most selmonid species are listed under the DPS policy because there's ecologically distinct units. But looking at the selmonid species, salmon. But I think the main distinction to draw between species, subspecies, and DPS is that species and subspecies are recognized taxonomic terms. There might be debate about the exact definition of that taxonomic term within different taxa, but it is a recognized taxonomic delineation. DPSs are entirely a creature of statute. They were designed by to give the service the authority to list distinct population segments of species or subspecies so that that geographic area could be provided protection while the wider range was doing well. This isn't in our briefing because this issue wasn't directly addressed. But if you go and look at the legislative history, they use the American alligator as an example. In that case, the American alligators, I may invert this, but I think I've got it right. The American alligators population in Florida was tanking. And so they wanted to be able to protect the American alligator in Florida, but it was doing fine in Mississippi and Louisiana. So they provided them with this ability to list a distinct population segment, even though, well, let's say for the sake of argument, that the American alligator wouldn't be delineated as a subspecies under a taxonomic determination. Got it. But not an issue here. Got it. Yeah. Thank you, Your Honor. All right. Did Mr. Yates reserve any time for? He reserved two minutes. All right. So we've used up more than that time, but we were active questioners. If you'd like to take the two minutes for rebuttal, you may have it. But you don't have to take it. I will keep it very brief and just address the exhaustion waiver issue related to the challenge in non-climate geographic variation or the methodological concerns related to that. So I would point Your Honor's attention to JA547 of Zinc 2017, where he directly makes this... JA527 or 47? 47. So that's the first he directly refers to the non-climate geographic variation standard and the possibility of manipulation as the bane of subspecies descriptions due to similar reasons we've outlined here. Remsen, which I don't have the JA site before me, but it's in the briefing, I think at maybe 479. No, 356 also raises sort of broader theoretical concerns about delineating subspecies and manipulation. I'll make a second point. Is that point also reflected in the comments that cattle growers raised before the agency? Well, no, Your Honor. So that goes to my second point, is as my... Or in the petition for delisting. So the cattle growers only submitted a petition for delisting, and that's what triggered the rulemaking here. And I will note, as my friend has noted, there are many, many ways to delineate subspecies. So cattle growers, when it's submitted its rulemaking petition after this hadn't been analyzed since 1996, wasn't in a position to sort of predict through a crystal ball the precise standard that the service was going to apply. So we would submit respectfully that I'm not sure the exhaustion requirement is quite so strict that a petitioner needs to specifically predict the standard that's going to be applied in order to challenge it as arbitrary and capricious. You said there are many, many ways to define subspecies? Correct, Your Honor. There are a number of ways to define subspecies in the literature, not all of them based on non-clinical geographic variation. Thank you. I appreciate it. The case is submitted.
judges: Pillard; Rao; Childs